1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF CONNECTICUT
2
     - - - - - - - - - - - - - x
3
     UNITED STATES OF AMERICA,    :    No. 3:19-cr-00303(SRU)
4                    Government,  :    915 Lafayette Boulevard
                                  :    Bridgeport, Connecticut
5              v.                 :
                                  :    August 13, 2020
6    SIMON HESSLER,               :
                     Defendant.   :
7
     - - - - - - - - - - - - - x
8

9                              SENTENCING

10

B E F O R E:

11
         THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.
12

13   A P P E A R A N C E S:

14
         FOR THE GOVERNMENT:
15
             UNITED STATES ATTORNEY'S OFFICE
16                 450 Main Street, Room 328
                   Hartford, Connecticut  06103
17           BY:  NANCY V. GIFFORD, AUSA

18
         FOR THE DEFENDANT:
19
             BUTLER, NORRIS & GOLD
20                 254 Prospect Avenue
                   Hartford, Connecticut  06106-2041
21            BY:  BETHANY LYNNE PHILLIPS, ESQ.

22

23                 Sharon L. Masse, RMR, CRR
                     Official Court Reporter
24                 915 Lafayette Boulevard
                  Bridgeport, Connecticut  06604
25                 sharon_masse@ctd.uscourts.gov

1          (Proceedings commenced at 10:15 a.m.)

2          THE COURT:  Good morning.

3          MS. GIFFORD:  Good morning, Your Honor.

4          MS. PHILLIPS:  Good morning, Your Honor.

5          THE COURT:  We're here for sentencing in the

6  matter of United States v. Simon Hessler.  Could I have

7  appearances, please.

8          MS. GIFFORD:  Nancy Gifford, Assistant United

9  States Attorney.  With me at counsel table is Special

10 Agent Wendy Bowersox of the FBI.

11         THE COURT:  Thank you.

12         MS. PHILLIPS:  Good morning, Your Honor.

13 Bethany Phillips on behalf of Mr. Hessler, who is seated

14 next to me -- across from me at counsel table.

15         THE COURT:  Very good.  Thank you.

16         And present by video I believe is Lauren Harte

17 of the U.S. Probation Office.

18         MS. HARTE:  Good morning, Your Honor.

19         THE COURT:  Good morning.  We are all masked,

20 obviously, pursuant to court order, so I'm just simply

21 going to ask everyone to keep their voices up.  I know I'm

22 relatively soft-spoken.  If anybody has trouble hearing

23 me, please let me know that.  I will try to increase the

24 volume.  And I urge all of you to use the mics and to

25 speak somewhat forcefully.

1         On December 11 of last year, Mr. Hessler

2    appeared before Judge Garfinkel and entered a guilty plea

3    to Count One of an information charging him with

4    production of child pornography, in violation of 18 U.S.C.

5    Section 2251(a).  I approved and adopted Judge Garfinkel's

6    recommendation regarding that plea on January 10, 2020.

7         A presentence report was prepared for the Court

8    by the U.S. Probation Office.  The initial report was

9    dated July 16, as was the first addendum.  The second

10   addendum was dated July 27, 2020.  I have reviewed the

11   presentence report, the addenda, and I've consulted with

12   Ms. Harte, who has been involved with the preparation of

13   the PSR.

14        In addition, in preparation for sentencing

15   today, I've reviewed both parties' memoranda, as well as

16   the letters and psychological reports that were attached

17   to the defense memorandum.

18        Ms. Phillips, let me make sure that you and

19   Mr. Hessler have had a chance to review the presentence

20   report and the addenda to that report.

21        MS. PHILLIPS:  Yes, Your Honor, we have.

22        THE COURT:  Do you have any objections to any of

23   the factual statements that are set forth there?

24        MS. PHILLIPS:  No, Your Honor.

25        THE COURT:  Very good.

1          Ms. Gifford, has the government had the same

2   opportunity?

3          MS. GIFFORD:  Yes, Your Honor.

4          THE COURT:  Any objections?

5          MS. GIFFORD:  No, Your Honor.

6          THE COURT:  All right, thank you.

7          I'm going to adopt the factual statements of the

8   presentence report as the findings of fact of the Court in

9   this case.  I'm also going to accept the plea agreement,

10  signed and filed on December 11, being satisfied that it

11  adequately reflects the seriousness of the actual offense

12  behavior and that accepting it will not undermine the

13  purposes of sentencing.

14          Mr. Hessler today faces the following maximum

15  and minimum penalties:

16          A term of imprisonment of between 15 and 30

17  years; a term of supervised release of between five years

18  and life; a fine of -- I have $250,000.  Is that correct?

19          MS. GIFFORD:  That's correct, Your Honor.

20          MS. PHILLIPS:  Yes, Your Honor.

21          THE COURT:  Very good.  There's also a special

22  assessment of $5,100.  There is restitution potential, and

23  there's a forfeiture potential, but I understand the

24  government has moved to withdraw the forfeiture?

25          MS. GIFFORD:  That's correct.  The forfeiture

1    related to a cell phone and a thumb drive that are in

2    State custody and still part of the State case, so the

3    State is going to deal with the resolution of those items.

4              THE COURT:  Very well.  So I'll grant the motion

5    with respect to forfeiture.

6              Do we know whether there is any claim for

7    restitution?

8              MS. GIFFORD:  So, Your Honor, we also could have

9    sought to forfeit the defendant's residence as the

10   location of where the production occurred.  We worked out

11   a resolution that amounted to the defendant paying $50,000

12   in restitution to the victim.  We did not pursue the

13   forfeiture of the residence.  And as a result of that

14   agreement, there is no further restitution being sought

15   and no further forfeiture.

16             THE COURT:  Very good.  Thank you.

17             MS. PHILLIPS:  Your Honor, if I may, just as to

18   the $5,000 special assessment.  My client has paid the

19   $100 special assessment, but I did provide probation and

20   the government, the Court with some further information in

21   support of his financial affidavit in terms of

22   establishing that he -- we are asserting that he does not

23   have the ability to afford to pay the $5,000 special

24   assessment, and that's been provided to probation.

25             THE COURT:  Okay.  Is financial ability to pay a

1    factor in terms of deciding whether a special assessment

2    needs to be imposed?  Certainly with a hundred dollars we

3    don't consider whether there's financial ability.  The

4    5,000 "special" special assessment, if you will, comes up

5    rarely, and I've not faced a question of --

6              MS. GIFFORD:  It does require a finding that the

7    defendant is not indigent, Your Honor.  So a finding that

8    he is indigent means he does not have to pay the $5,000,

9    but there is a discussion, there is need to find whether

10   or not he has the ability to pay it before deciding

11   whether or not to impose it.

12             THE COURT:  All right.  What information was

13   provided to probation?

14             MS. PHILLIPS:  Your Honor, the standard -- the

15   standard forms, including the declaration of offender net

16   worth, a cash flow statement.  And, additionally, there

17   was a documentation.  Mr. Hessler wrote in that when his

18   hotel, the corporation sold the hotel, there was a

19   $7 million transfer.  I provided an affidavit from the

20   closing attorney who handled that, confirming that

21   Mr. Hessler received no money from that closing, as there

22   was many liens and everything.

23             So with that, the only thing he owes -- owns is

24   his house in Ellington, which is subject to a mortgage to

25   his father.  And then with his future incarceration, that

1   consists of all the property he owns right now.

2           THE COURT:  Is there any equity in the home?

3           MS. PHILLIPS:  I believe --

4           THE DEFENDANT:  No.  It's about 75,000 owed on

5   top of the -- I'm sorry, sir.  No, the house was -- is

6   worth about 250,000 and right now with -- without counting

7   interest and the late fees, I'm about 325,000 in arrears

8   to my father.  I have only made mortgage payments for a

9   year and a half.  I've been arrested for the past almost

10  two years.

11          I did pay the $50,000 fee, and I did transfer

12  all my vehicles, all my property, everything that I owned

13  to my ex-wife.  I have nothing left.  If I'm looking at 30

14  years in prison, I -- there's no chance of me making money

15  there.

16          THE COURT:  Ms. Gifford?

17          MS. GIFFORD:  So in looking at paragraph 76 of

18  the PSR, it appeared that defendant had some debt that was

19  outstanding.  I did look at the cash flow discussion

20  range, the hotel, and it didn't appear that he had any

21  assets.

22          Now, I have not talked to his ex-wife about the

23  value of the house.  I just looked back; she's indicating

24  that the house has a higher value than the defendant is

25  indicating.  I haven't had a chance to speak with her.  If

1    I could have a moment, I could follow up --

2            THE COURT:  Sure.  Is that the house that's

3    being transferred to her as part --

4            MS. GIFFORD:  So the house is not being

5    transferred to her.  So the house, it's a little

6    complicated, but the house belongs to Mr. Hessler's

7    father.  He holds the mortgage on it.

8            XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15           THE COURT:  Okay.  You can confer with her.

16           MS. GIFFORD:  Thank you, Your Honor.

17           (Pause.)

18           Thank you, Your Honor.  According to the

19   ex-wife, the value -- the mortgage on the house is around

20   $180,000.  Again, that's held by the father, so I'm not

21   sure where late fees and other costs like that would come

22   in.  The value of the house, according to a realtor who

23   recently came out and evaluated the house in case it were

24   to be put up for sale, is $250,000.  So there should be

25   some equity in that home.

1          MS. PHILLIPS:  May I just have a moment, Your

2     Honor?

3          (Pause.)

4          THE DEFENDANT:  Your Honor, if I may speak?  On

5     regards to the house, I owe my father a fortune because of

6     the business and the failed ventures.  When the divorce

7     happened, we worked very closely with attorneys on both

8     sides to ensure that my daughter, my ex-wife would have a

9     safe place to live.  That comes at a great price.  My

10    father pays for the taxes, the insurance on the house,

11    everything other than utilities.  He's agreed to that for

12    his granddaughter to have a safe place.

13         At this point, because of me having been in

14    default for almost two years in mortgage, plus about a

15    year prior to that, he could technically quit claim the

16    property very quickly.  I don't want it to get to that.  I

17    don't want my daughter and my ex-wife to be homeless.  He

18    has no legal obligation or financial obligation, I owe the

19    house to him --

20         MS. PHILLIPS:  Let me just jump in there.  I

21    have a document that shows the mortgage as $176,880.

22    Quite honestly, I was not provided with a late appraisal.

23    I know market values have dropped, Your Honor, and he has

24    not made any payments on this mortgage.  He doesn't have

25    the future ability to earn anything at this point, and his

1    limited equity in the house and what that may be, that's

2    all that there is, Your Honor.  It's a house in Ellington,

3    Connecticut.

4              THE COURT:  Do I have the ability under the

5    statute to impose any lesser amount than the $5,000?

6              MS. GIFFORD:  No.  I'm sorry, Your Honor.  I

7    believe it's $5,000 is the only amount.  It's just whether

8    or not he has the ability to pay.

9              THE COURT:  All right.

10             MS. GIFFORD:  But just know that the money for

11   that $5,000 goes to a fund that's being established in

12   Congress to pay other victims of child pornography, and in

13   this particular case the defendant had hundreds and

14   hundreds of images of child pornography that are not part

15   of the count to which he pled.  And I do think that it

16   would be important, if the Court finds he has the ability

17   to pay, to impose it here so that there's some money going

18   to those other victims who are not charged.

19             THE COURT:  Can the 5,100 be paid off through

20   the inmate fiscal responsibility program?

21             MS. GIFFORD:  I believe so, Your Honor.  It does

22   not need to be paid today, if the Court were to order it

23   to be paid today, but then it would accumulate over time.

24             MS. PHILLIPS:  May I just have a moment, Your

25   Honor?

1          (Pause.)

2          Your Honor, I asked Mr. Hessler what was the

3    purchase price of the house.  He's not quite sure.  I know

4    that it's a significant mortgage that is owed to his

5    father, and that, again, that limited equity is what

6    Mr. Hessler has.  Of course, pursuant to the divorce

7    decree, that's to be divided too.  So it's not even --

8    whatever that limited amount of equity is is to be divided

9    pursuant to the divorce decree.  So that's even less.  And

10   then with his inability to earn anything in the coming

11   years, he does not have the financial ability to pay that.

12          We're not disputing, he's -- you're going to

13   hear from him in a little bit.  He's taken responsibility

14   for these offenses; and, again, he's here to -- you're

15   going to hear a lengthy statement from him.  But in terms

16   of what the Court has to look at here and make the finding

17   that he has the financial ability to pay, that's the

18   limited issue, and he does not, Your Honor.

19          THE COURT:  Well, from what I'm hearing about

20   the house, there is some limited equity in the house,

21   certainly ten thousand dollars, which would be the five

22   thousand we're talking about.  So I don't think I can find

23   that he does not have the financial ability to pay.  The

24   question is really how to access that because without a

25   home equity loan, who knows how he can get that money out.

1                  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2        XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3        XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4        XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5                  And to the extent that it's permissible to pay

6        it off through the inmate fiscal responsibility program,

7        I'm going to order that that be done, which may increase

8        Mr. Hessler's chances of getting a UNICOR position within

9        the B.O.P., which pays significantly more than most prison

10       jobs.

11                  Ms. Phillips, are you in agreement that there is

12       $50,000 of restitution payable by Mr. Hessler?

13                  MS. PHILLIPS:  Yes, Your Honor.  That has

14       already been paid.  That was paid at the change of plea.

15                  THE COURT:  Oh, very well.  So I don't need to

16       include that in the judgment anywhere?

17                  MS. GIFFORD:  No, Your Honor.  Thank you.

18                  MS. PHILLIPS:  No, Your Honor.

19                  THE COURT:  All right.

20                  In my view, the Sentencing Guidelines have been

21       correctly calculated in the presentence report.  We begin

22       with a base offense level of 32.  Four levels are added

23       because of the age of the minors, that is, less than 12.

24       Four levels are added because the material involved

25       sadistic or masochistic conduct.  Two levels are added

1    because there was sexual contact.

2                    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXX

4           That gives us a total -- an adjusted offense

5    level of 44.

6           Is the government making a motion under 3E1.1B?

7           MS. GIFFORD:  Yes, Your Honor.

8           THE COURT:  That motion is granted.   Three

9    levels are subtracted for acceptance of responsibility,

10   which results in a total offense level of 41.

11          Mr. Hessler is in Criminal History Category I,

12   and the resulting Sentencing Guideline range is 324 to 360

13   months of imprisonment, five years to life of supervised

14   release, a fine of between $50,000 and $250,000, and the

15   mandatory special assessment of $100.

16          Let me hear any objection to that calculation of

17   the Sentencing Guidelines or the statement of the

18   resulting Sentencing Guideline range.

19          MS. GIFFORD:  No objection, Your Honor.  I think

20   the Court said fifty thousand to two-fifty for the fine.

21   I don't believe there's a mandatory minimum for the fine.

22   It's just up to 250,000.  The 50,000 is just the

23   restitution that he already paid.

24          THE COURT:  Right.  That's the Guideline range.

25          MS. GIFFORD:  Oh, the Guideline.  I'm sorry.

1    Thank you.  No, no objection then.

2              THE COURT:  All right, thank you.

3              MS. PHILLIPS:  No objection, Your Honor.

4              THE COURT:  All right.  Does a victim wish to be

5    heard today?

6              MS. GIFFORD:  Yes, Your Honor.

7              THE COURT:  All right.

8              MS. GIFFORD:  Is this the right time?  And would

9    you like her to come up and speak at the lecturn?

10             THE COURT:  Either there or at your table,

11   somewhere where she has a microphone.

12             MS. GIFFORD:  Okay.

13             THE VICTIM:  What do you say when you only have

14   a moment in time to address the person who has done things

15   you never even dreamed were humanly possible?  I've

16   written so many letters where I've poured out my heart and

17   soul, and they ended up in a crinkled ball on the floor as

18   I lamented having to write a victim's impact statement in

19   the first place.

20             XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6           I can't even begin to tell you how destroyed I

7   was when I found out.  My heart is shattered and my soul

8   is crumbled.  I went from being a happy, proud,

9   self-confident wife and mother to a broken and defeated

10  shell of a woman.  When I look at you, I no longer see my

11  best friend, the man I married, the person I thought I'd

12  grow old with.  Instead, I see a scared, evil little man

13  who lost the battle against his own destructive thought

14  patterns, a man who has lost everything, a man who will

15  grow old alone.  I see a man who kept feeding the demons

16  inside him, a man who disconnected from the real world and

17  spiraled out of control until he hit rock bottom and threw

18  away everything good that he ever had.  I see a man who

19  tried to buy a child online for a weekend of limitless sex

20  and slave training.  I don't know you Simon, and I guess I

21  never really did.  I expected strength from a person who

22  didn't know the definition of the word.  I expected

23  courage from someone who is nothing but a coward.

24           Listening to everything that has happened and

25  learning about most of it through police reports and media

1    articles has been a nightmare.  It's been like watching a

2    horror movie where the anxiety keeps building and

3    building, and you never even know if you've gotten to the

4    scariest part.  You keep on watching, listening and

5    learning about every betrayal and unspeakable act, while

6    doing everything in your power to hold back your rage,

7    while holding on to whatever dignity you have left.

8              I've learned new phrases, like guilt by

9    association, libel and slander.  I've been judged because

10   of your actions.  People assumed I knew what you were

11   doing, but you kept it well hidden and completely

12   blindsided me.  I'm no longer the person that I once was.

13   I've lost part of my identity.  I'm no longer a wife.

14             XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXX

20             The accusations against me have hurt me beyond

21   belief.  Sadly, people believe everything they read and

22   jump to conclusions without hearing the whole story.

23   Thankfully, the people who truly know me know that I could

24   never have been involved with such heinous acts.  Through

25   all of this, I've learned that you never really know how

1    strong you are until being strong is the only choice you

2    have.   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.   We

3    are strong.  You have no power or control over us anymore.

4    We will move forward with our lives and do great things.

5    We will choose honesty over lies, good over evil, and love

6    over hate.  We will begin to help others and see the good

7    in people.  Your actions do not and will never define us.

8           You might think that I hate you, but I don't.

9    Hating you would mean that you still have a hold on my

10   heart and that I care.  It would mean that I think about

11   you, and I don't.  You are my past and that is where you

12   will stay.  There is no room for you in my future.

13          So in answer to my own question, what do you say

14   when you have a moment in time to address the person who

15   has done things you never thought were humanly possible, I

16   say this:  For the next thirty years I will be going to

17   bed every night knowing you will be in prison when you

18   can't hurt anyone else.  I hope that every night, as you

19   lay there on your cot drenched in a cold sweat from the

20   nightmares that will surely haunt you, that you remember

21   all the damage you caused and the reason you're there.

22          Thank you.

23          THE COURT:  Thank you.

24          Ms. Phillips, would you like to make whatever

25   comment you want to in support of the defendant?

1          Mr. Hessler, I'll hear from you if you wish to

2   make a statement.  You're not required to say anything,

3   but I would, of course, be interested in hearing from you

4   at the appropriate time.

5          And when the two of you are done, I'll hear from

6   Ms. Gifford.

7          MS. PHILLIPS:  Thank you, Your Honor.

8          Mr. Hessler wants to read his statement first,

9   and then I'll address the Court, Your Honor.

10          THE COURT:  Thank you.

11          THE DEFENDANT:  Your Honor, I apologize.  This

12   is a fairly lengthy statement, but I do believe it's

13   needed at this point.

14          Your Honor, thank you for granting me this

15   opportunity to address the Court today.  My attorney has

16   provided the Court with several psychiatric reports,

17   including diagnosis, and an outline of recommended

18   treatment completed since my arrest in 2018.

19          I have previously provided the Court with two

20   letters outlining my past mental psychiatric history and

21   present condition.  These findings are the cornerstones of

22   my new foundation as a human -- diagnosing my conditions,

23   understanding the results, and obtaining proper ongoing

24   psychiatric and medical care, to ultimately be reborn into

25   the genuine, kind, religious person, free of all sins and

1  addictions, the whole person I always carried very deep

2  inside of me.

3        I have acknowledged my horrific actions, deeds

4  and decisions.  I will not present any excuses.  I have

5  none.  Instead, I will share with you insight into how I

6  became detached from reality.

7        I was born with a brain injury wherein the bones

8  in my head did not fuse together properly.  I was placed

9  in intensive care and given up for adoption, rejected at

10  only fours month old.  My biological mother died as a

11  result of the birthing process.  The remainder of my

12  biological family either were unable or unwilling to

13  provide me a home.

14        Growing up, I struggled.  I was diagnosed with

15  learning disabilities and ADHD.  However, my bipolar

16  disorder, multiple personality disorder, severe

17  depression, severe anxiety and other conditions remained

18  undiagnosed, untreated until prison.  Although I always

19  struggled and experienced exhausting psychiatric issues,

20  countless failures and abuse, my legal problems only

21  started and occurred during the last two years prior to my

22  arrest, when all the elements of my house of cards came

23  crashing down at once, overwhelming me, my security, my

24  identity, my world, and leaving no safe refuge.

25        Due to several traumatic experiences, I lost my

1   childhood, carefree joy, and my innocence early.  Around

2   age 7, I discovered my adoption by mistake.  Around age

3   13, I was bullied and raped by a group of boys while

4   attending summer camp.  These were only a few of my

5   traumatic experiences I've had in my life.  I buried them

6   and their consequences deep inside of me, in an attempt to

7   ignore reality, pain, shame, and to protect my family.  I

8   was different.  I was slight, small and shy.  I was overly

9   emotional and prone to random, extreme mood swings.  I was

10  and I am an easy target.  I felt ashamed and told no one

11  of this.

12          During this period of time, I also sustained the

13  worst of two -- the worst two head injuries of several and

14  a knife/gun robbery.  Our apartment was burglarized.  I

15  retreated into myself, to my room, to places I felt safe,

16  and played countless hours with my can of wheels, creating

17  a virtual world and situations where pain, hurt, shame,

18  bullying and abuse did not exist.

19          Until my arrest, I moved homes very

20  frequently -- towns and often countries -- until I arrived

21  in the United States of America and attended high school,

22  where I struggled until completion.  I never was able to

23  build, maintain or grow long-lasting friendships.

24          I attended college here in Connecticut until I

25  dropped out.  I was overwhelmed with my newfound freedom

1    and college experiences, as my family had returned

2    overseas.  I was totally alone in this great country,

3    trying to live my American dream.  When my world felt

4    ended, I tried to commit suicide by overdosing on pills.

5    When I knew my college life was over in shame, I was

6    rushed to the hospital, where I was promptly admitted and

7    treated.  I did not tell my parents.

8         My parents have always been there for me, always

9    supportive, loving, caring and sheltering.  I could not

10   admit to my failures to shame them and hurt them.  So I

11   pretended I could manage all.  But as my life proves, I

12   could not.

13        They provided me with my lifelong dream of

14   owning and operating a hotel.  I was good at customer

15   service only.  I did my best.  However, the business lost

16   hundreds of thousands of dollars every year until my

17   arrest.  I owe over 13 million.  I had no mentor, no

18   confidence, no financial understanding or experience.  I

19   was surrounded in my personal and professional life by

20   people who claimed good intentions, yet it always ended

21   one-sided, bullied, abused and used.

22        For the two years prior to my arrest, I fell

23   into a daze, an uncontrollable craving for oxycodone and

24   other drugs in an effort to ease my pains.  I became

25   hooked when I was prescribed by our family doctor the

1    painkillers while attending -- while I was waiting

2    bilateral hernia surgery.  It was extremely painful,

3    caused me physical and emotional issues, and to this day I

4    continue to suffer from the surgery, the mesh, and the

5    unexpected consequences.

6            During this time, I also sustained a severe

7    injury to my back while volunteering as a certified

8    emergency medical technician on an ambulance call with

9    Ellington volunteer ambulance.  My perceived need for

10   relief from my physical and mental pains consumed me.  I

11   spent countless hours each day in a drug-induced stupor,

12   surrounding myself by the disturbing and disgusting world

13   of graphic pornography.  I failed my EMT recertification

14   exam.  The real world was overtaken by my constant pursuit

15   of temporary pain relief, both mental and physical, as

16   well as my desperate search for happiness, joy, peace and

17   acceptance.  I hurt the ones I loved.  I hurt the ones

18   that loved me, people around me.  I am sorry.

19           The virtual nightmare I was trapped inside of

20   became my daily reality to the level that I often failed

21   to work at the hotel with my staff, my dream, unable to

22   face and then function the last few years.  Instead, I

23   retreated, hid and indulged in my horrific actions, deeds

24   and decisions, mostly alone for weeks on end in an office

25   building.

1        In prison, I was diagnosed with bipolar

2   disorder, multiple personality disorder, severe

3   depression, anxiety, panic disorders, and post-traumatic

4   stress disorder, which include nightmares and flashbacks

5   from my long EMT career, including times when people I

6   tried to save died in my arms and my care, as well as

7   reliving some of my family and life traumas and decisions

8   in vivid detail.

9        Since being arrested, I have been mistreated

10   constantly by the Connecticut correctional system.  The

11   following are only a few brief examples.  These were

12   excruciating, in part due to the effects of severe drug

13   withdrawal, identity loss, purpose loss, living a virtual

14   world:

15        (1) Depriving me of blanket and food;

16        (2) Depriving me of toiletries, including toilet

17   paper.

18         (3) Told by guards I should commit suicide, a

19   human monster.  Suicide is my only option out of prison,

20   and the guards are my judge, jury and executioner, and

21   they found me guilty.

22        (4) Repeatedly being called Hessler the

23   Molester, Dungeonmaster Freak, Ripper, Pedophile, Rapist

24   over the public address system in the housing block,

25   comments on the two-way radios and in front of other

guards and inmates, guards reading information about me on
their cell phones, and constant bullying in the halls,
etc.

(5) Lights in my cell at HCC and Garner Prison
were either constantly left on or turned on and off
constantly, along with repeated banging on the cell door
and window in an effort to, quote unquote, break me and
cause sleep deprivation, same as in segregation in
Cheshire.

(6) Physically assaulted by big guard while
defenseless in handcuffs, repeatedly hit on my left side
near my hernia mesh.  Event was caught on video and audio
recording, including several death threats and promises
from that guard.

(7) Told several times that the guard will
place a hit on me via lifers, and that the guards will
kill me, confirmed by many inmates.

(8) Evidence planted in cell by a guard during
shakedown, incident caught on tape and witnessed again by
many inmates.

(9) Psychiatric medication withheld several
times by specific guards, one crucial medication often not
given via the nurses, that is, it will not scan properly.
No efforts made in the past month to address this issue.

Telephone account often disabled for weeks, even

1    with money on the account.  No reason ever given.

2            Books, incoming mail, outgoing mail often is

3    unreliable or just becomes lost or missing.  Personal

4    items stolen, told to replace them at my cost, even when

5    items disappeared in a laundry bag.  I have no funds.

6            I respectfully ask for this Court to order and

7    grant me single-cell status and bottom-bunk status

8    designation on my sentencing order for the entire time of

9    my incarceration due to my prison experiences, medical

10   condition, treatment, psychiatric condition, treatment,

11   and my concerns for a safe, healing and unthreatening

12   surrounding.  Protected custody does not exist in the

13   federal prison.  My story and charges are easily

14   accessible by inmates and absolutely horrific; I agree.

15           My first month ever in prison was found at

16   Hartford Jail and Garner Prison.  I was in 24/7 solitary

17   confinement except for occasional showers, social/health

18   worker, psychiatric visits, and a visit of my attorney.  I

19   had started to experience horrible extreme drug and life

20   withdrawal effects.  This haze and erratic time would last

21   for an extremely long time.  No books, music, shows,

22   contact or commissary to distract me, only an occasional

23   meal delivered through the metal trap door with comments;

24   four concrete cold walls, and a constant harassment by

25   guards and inmates.  My mind and body felt as if I was on

1   a derailed roller coaster, plunging to certain death at

2   300 miles an hour.  I was erratic, delusional and could

3   not grasp the current situation.

4           On my first night at Cheshire, the guard

5   switched my prearranged cell assignment.  I could hear all

6   their comments and laughter, while I was terrified and

7   shaking in the bullpen cage.  I had been unable to see

8   much, including people, surroundings, and potential

9   threats because my prescription eyeglasses were destroyed

10  at Hartford jail during the booking process.  I am

11  extremely nearsighted.  After almost two years in jail

12  asking regularly for eyeglasses, the Connecticut

13  correction system has yet to replace them.  Thankfully, I

14  was able to receive a pair from the outside, from my

15  ex-wife, without need of prescriptions, at my cost.  Until

16  then, I lived in constant fear, unable to identify people,

17  places or threats around me, nor able to follow commands

18  from the guards because I was unable to even see my cell

19  number, etc.

20          My experiences at Cheshire prison started

21  horribly.  After a month of solitary confinement and zero

22  social interaction, unable to see well, and still facing

23  the effects of withdrawal, bullying and harassment, this

24  is what happened:

25          My first ever, quote unquote, cell mate, a very

big, strong firefighter, with alleged organized crime

ties, per him, refusing to give me a few sheets of his

toilet paper.  Being ridiculed by the guards in our unit

for asking for toilet paper and being unable to see my

cell and surroundings, the guard said, quote unquote, Go

back to your dungeon.  You don't deserve any, and you

don't deserve to live.  And my first cell mate threatening

to kill me because he did not want to share his cell, did

not like my charges and the media stories.  I don't blame

him.

This threat was on the very first night of me

sharing a confined space with another man, a man I didn't

know.  In fact, he said as soon as the solid metal door

closed for the night, he would kill me.  I remained awake

for the full night, terrified, confused.  In the morning I

requested to voluntarily go to the perceived safety of

segregation, as I was not allowed to change cells, and

this was my only option available.

Segregation in Cheshire is similar to being

struck in a sinking submarine, with constant bullying and

banging on the metal walls to the point that the bunks

shake all night and the walls feel as if they are being

broken, the sound instantly flashing to the horrific

sounds of the guns used in Vernon's 2016 IMPACT drill.

They were blank and fake, yet this was very real, and I

1    had no way of escaping.  I was scared, confused,

2    overwhelmed, withdrawn from my drugs, sins, and needed to

3    feel safe.  This was the beginning of several horrific

4    prison experiences in the only safe protected custody

5    space Connecticut offers at-risk inmates.

6             My PTSD and the history set forth makes me

7    incapable of serving my sentence safely, positively and

8    productively while forced to live in a small cell with

9    other random, often changing, and mentally unstable

10   inmates.

11            I am a model inmate with no infraction or issues

12   since my arrest.  I am fine in a social setting, as I have

13   been there in Cheshire; however, I need the fears to

14   lessen when the door is locked to my safe space.  I am

15   unable to choose my environment or people around me,

16   compared to my past.  Please, allow my future prison cell

17   to be a calm, safe and positive setting.  Please consider

18   this request, the attached written statement, and my

19   desire to spend all or as much of my prison time in

20   Massachusetts Federal Medical Center, FMC Devens, as it

21   will allow my 77-year-old father the possibility to visit

22   from France, keeping me in the New England area, and also

23   it seems best suited for my emotional, psychiatric and

24   medical issues.

25            I would like an opportunity to continue my path

1    to becoming a whole person, a person capable of managing

2    illness and conditions with proper support and care.  I

3    lost my mom to cancer this year in March.  I have not yet

4    been able to grieve.  My father has cancer.

5            I am sorry for everything I have done.  It was

6    never my intention, desire, conscious decision to

7    disappoint, hurt or cause shame and failure to anyone,

8    especially those I loved and loved me.  I cannot change

9    the past.  If I could, I immediately would.

10           Ms. Maya Angelou once said, quote unquote:  I

11   did then what I knew what to do.  Now that I know better,

12   I do better.

13           Prison and my decisions, deeds and actions have

14   cost me and those around me everything.  I, for the first

15   time ever, have no life, no secrets, no addictions and no

16   sins.  I am not ashamed, nor hiding or running any longer.

17   God has rescued me and opened my eyes and ears.  I accept

18   full responsibility for my past actions.  I ask only to be

19   safe, receiving the proper ongoing medical and psychiatric

20   care that I never once had before, so that I can grow from

21   being a small, scared man to a valuable man.

22           With my eternal regrets and sorrows, thank you.

23   Simon Hessler.

24           THE COURT:  Thank you.  Ms. Phillips?

25           MS. PHILLIPS:  Thank you, Your Honor.

1          It's been a long road from that first day when I

2    met Simon in 2018.  I can tell you that the man you see

3    here today is a different person.

4          When I first met him, it was at the Garner

5    Correctional Institution in Newtown, and although I've

6    been practicing 20 years, I can't say that I've ever had a

7    situation where they bring me into a room, and my client

8    is in the room but in a cage.  I had to have him sign

9    things, and we passed a pen that was bendable.  It was an

10   environment I've never seen before in my life.

11         Over time, he was able to meet with Dr.

12   Lothstein, and I know that was extremely helpful for

13   Simon.  For the first time he was receiving some

14   psychiatric care.  He then, when he was transferred up to

15   Cheshire, went at my behest to see Medical, and once he

16   was placed on his current medications and I came back the

17   next time, it was a different person.  He was clear,

18   thoughtful, he was understanding things, and we were able

19   to have fruitful discussions.

20         What Simon told the Court today about his

21   treatment at Cheshire and through the Connecticut DOC

22   system is no lie.  I've personally observed things.  And,

23   in fact, my sentencing memorandum to the Court was filed

24   on July 27.  I was awaiting a letter that Simon wanted to

25   write so I could attach it to my sentencing memorandum,

1    which I did.  However, I did not receive it.  And I set up

2    a legal call.  I said, "Simon, did you send it?"

3              "I did."

4              "I didn't get it."  I said, "I have a duty."

5              I asked the guard to go into his cell because he

6    saves everything, and he got a copy and faxed it to me,

7    and that's what I provided to the Court.  I can tell the

8    Court two days ago I got his letter, August 10th, and the

9    postmark was in Westchester, New York, yet Simon is at

10   Cheshire Correctional in Connecticut.  They take his mail.

11   I've started sending him overnight mail.  He doesn't get

12   it until ten days later.

13             I sent him a copy of the briefs.  Ten days later

14   he hadn't received it.  He asked his CO to go get it, and

15   it was in the mail room.

16             And then that's the beginning of it, Your Honor.

17   The day Simon came here, entered his plea before Judge

18   Garfinkel, and a few days later we were in Superior Court,

19   as Your Honor knows he has charges pending in Part A in

20   Hartford, we wanted to transfer, as part of the plea

21   agreement, him to federal custody.  And that's one of the

22   benefits that took -- there was a lot of negotiations that

23   went into Mr. Hessler's cases.  And one of the benefits

24   afforded to Mr. Hessler is that he will be a federal

25   prisoner.

1          So when he -- after he entered the plea here in

2     Bridgeport, we went up to Hartford and entered a plea

3     there.  In the morning I made a motion to reduce his bond,

4     with the understanding we would go back that afternoon and

5     his bond would be raised again in Hartford.  But by doing

6     that, he then transferred to officially a federal inmate.

7     When he got back to Cheshire that afternoon, I think I met

8     with him about a week later, and he said that the threats

9     had significantly gone down because the unit correctional

10    officers had told each other that the unit was hot.  And

11    what "hot" means is that he's now a federal inmate, so

12    they can't go after him as much.

13         Now, with time, that subsided.  He's still

14    threatened.  When I go to visit, they call him as a --

15    he's in protected custody.  They say -- they announce his

16    legal visit over the loudspeaker, as he tells me, and say

17    horrific things.  He's been beaten.  And I raised this

18    with the State as well, and Judge Baldini ordered special

19    transport for him because one of the most terrifying

20    experiences was on his transport to and from court.  But,

21    again, I discuss this because here we have a plea

22    agreement where we're asking the Court to impose the 30

23    years, and his case, again, is not that simple because of

24    the co-occurring charges in Hartford.  And, again, one of

25    the benefits to Mr. Hessler and why we're asking for a

1    sentence of -- and I said 347 months because the

2    government does not dispute and has agreed that I could

3    ask for a reduction to include the time he's been

4    incarcerated.  So that's -- that's where we are.

5            As the Court can see from his statement here

6    today, Your Honor, I don't have to relive the charges.

7    They're egregious, they're horrific, and he has accepted

8    responsibility.  You heard that multiple times here today.

9    He has no excuses for that.

10           In his statement to the Court, he described

11   himself as a monster; that person was me.  When I traveled

12   down to Cheshire to review his presentence report with

13   him, he was visibly upset.  It was hard for him to read

14   and go over the conduct that's described in the PSR.

15           So I think now that he is on the correct

16   medication and he's clear, he has a good understanding.

17   And, Your Honor, he does have plans but -- for the future,

18   but he wants to be safe.  And part of that is informing

19   the Court of what's happened to him so the Court knows, in

20   support of what we're going to be asking the Court for, a

21   recommendation for confinement at FMC Devens.  I've

22   explained to Mr. Hessler it's just a recommendation.  The

23   Bureau of Prisons can place you where they want to place

24   you.  However, we do ask the Court to place a

25   recommendation for Fort Devens.

1          THE COURT:  On that point, let me inquire of

2     both counsel.  Is Devens a SOMP facility, Sex Offender

3     Management Program facility?

4          MS. GIFFORD:  I'm not sure.  If I could have a

5     moment, I could get the answer for the Court.

6          MS. PHILLIPS:  I do -- if you want to check, I

7     know that it's actually -- it's not, but they do have --

8     it's not a designated SOMP, but they do have various

9     therapeutic treatment.  And I provided -- I have a book on

10    the federal prisons, which I set various places to Simon

11    so he could determine where he wants to -- it does provide

12    self-help programs, residential drug abuse treatment and

13    individual counseling.

14         THE COURT:  Because, frankly, the concerns about

15    treatment I think are going to follow Mr. Hessler into the

16    federal system unless he is at a SOMP facility where

17    typically 60 or 65 percent of the inmates are sex offender

18    inmates; and, therefore, they not only have the treatment,

19    the programs, but people leave each other alone.

20         MS. PHILLIPS:  If I may, Your Honor, Fort Devens

21    does have an intensive residential Sex Offender Treatment

22    Program.  It's called SOTP-R, and that is offered at Fort

23    Devens, which is one of the reasons why he wants the

24    recommendation.

25         MS. GIFFORD:  That's correct.  I just confirmed,

1    too.

2              THE COURT:  All right.

3              MS. GIFFORD:  They do offer a sex offender

4    treatment program at Devens.

5              THE COURT:  Okay, thank you.

6              MS. PHILLIPS:  I would also be remiss, Your

7    Honor, I appreciate the Court -- I wanted to put this on

8    the record.  As Your Honor knows, Mr. Hessler was

9    scheduled to be sentenced last Wednesday.  On August 3,

10   the Seventh Circuit decided a case, *United States v.*

11   *Howard*, which had a differing opinion concerning the

12   charges compared to the Eighth Circuit and other circuits

13   concerning what constitutes production of child

14   pornography.  For the record, Your Honor, I can tell you

15   that I had a lengthy legal call with Mr. Hessler the night

16   before the sentencing was postponed.  I then traveled to

17   the Cheshire correctional facility to explain the case, go

18   over the ramifications and his options at that point.

19   Knowing the decision of the case, Mr. Hessler wanted to

20   move forward.  Again, he's prepared to, he wants to place

21   this behind him, and he was advised of the case.  I wanted

22   to place that on the record.

23             THE COURT:  What's the case?

24             MS. PHILLIPS:  Your Honor, it's *U.S. v. Howard,*

25   2020, U.S. at LEXIS 24360.  And what it stood for was the

1   proposition that certain conduct did not arise to

2   production of child pornography, which are similar to the

3   facts here.  However, there's a split in the circuits.

4   There's a similar case on point in the Eighth Circuit

5   which says, yes, this is production of child pornography.

6   But, nevertheless, the fact that it was decided so close

7   in time, I wanted to make sure Mr. Hessler was explained

8   about the opinion in that case.

9          So for all those reasons, Your Honor -- and I,

10   of course, I'd ask for, in addition to the recommendation

11   at Fort Devens, I'd ask that his sentence certainly

12   include mental health treatment and substance abuse

13   treatment, and I'd ask the Court to impose a sentence of

14   347 months.  Unless the Court has further questions.

15          THE COURT:  No.  Thank you.

16          MS. GIFFORD:  Thank you, Your Honor.

17          Given the serious nature of the charges here,

18   the offense that he's admitted to committing, I'm loathe

19   to spend much more time talking about Mr. Hessler, but I

20   am concerned about two things.  I want the Court to know

21   we take allegations of misconduct towards a prisoner very

22   seriously, and I did, upon receiving Dr. Lothstein's

23   report from Attorney Phillips, communicate with the

24   assistant state's attorney who has the companion case and

25   discussed what the best avenue would be to share the

1   allegations that are set in there about how he's been

2   treated.  She reached out to the Attorney General.  It's

3   our information that there is someone at the Attorney

4   General's Office that's looking into those allegations.

5           Second, I don't want the Court left with the

6   consideration that the defendant, because he may have been

7   treated poorly, was coerced into taking the plea, was

8   coerced into coming -- you know, to say, Oh, I'd rather be

9   in federal custody.

10          He's getting a significant benefit by the plea

11  agreement.  By working on a global resolution with the

12  federal charges and the state charges, he is saving time.

13  He was facing at least 30 years with the State.  He was

14  facing at least 15 years with us.  By working together and

15  pursuing a global resolution, he's getting a benefit, and

16  I don't think there's any doubt about that.  So I just

17  wanted the record to be clear on that.

18          Those two points aside, I wanted to express my

19  frustration right now hearing Mr. Hessler's lengthy

20  statement.  It reflects precious little about what he did.

21  Sterile statements about it was heinous or horrific does

22  little to really reflect the harm he caused the minor

23  victim here and what he intended to do if that little

24  child had been a twelve-year-old that he thought he was

25  buying.

1          "Now that I know better I do better" is the

2    quote that he gave.  He knew better.  Everybody knows

3    better.  You don't buy a 12-year-old child for two days of

4    limitless sex, defining the types of sex acts he wanted to

5    do.  You don't say that child is going to be delivered to

6    me, bound and gagged, and I'm going to leave you the

7    implements to do it in my trailer.  XXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX   He

9    knew better.

10          It's a solemn day today.  There's not a day

11   every day that I stand up in court and ask for the

12   statutory maximum.  But the offense the defendant pled

13   guilty to is among the most serious, production of child

14   pornography.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  The facts

16   supporting his guilty plea and his relevant conduct I

17   would submit are among some of the most egregious facts

18   that we've seen involving true depravity and predatory

19   behavior.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXX  The predatory actions on what he thought was

22   a 12-year-old DCF child are just unspeakable.

23          I spoke today with the trooper who was involved

24   in the undercover.  She's here in court.  I also spoke

25   with a sergeant in the Connecticut State Police to talk

 1   about their investigation.  They're both 16-year veterans,

 2   and they said this was among the worst case of someone

 3   trying to brutalize a child they had ever seen.  And if

 4   there's ever any question about the value of an undercover

 5   operation, this case stands as a shining example.  XXXX

 6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 8   XXXXXXXXX  They should stand in recognition of the work

 9   they did here saving, protecting the community, XXXXXXXXXX

10   XXXXXXXXXXXXXX

11           And I know the Court is being, again, asked to

12   impose a sentence at the statutory max, and I'm familiar

13   with the Court's recent sitting by designation on the

14   Second Circuit and the number of factors the Court

15   expressed in the *Muzio* decision when deciding these

16   significant penalties for sex offenders.  And I am

17   prepared to go through each of the factors that the Court

18   listed in the *Muzio* decision and why and how they apply in

19   this case, but I guess I don't want to also take the time

20   from the Court if the Court is satisfied that, based on

21   the record they have, and the PSR, and the sentencing

22   memorandums, it's prepared to go forward with the agreed-

23   upon sentence between the parties.  But I'm happy to go

24   through those if the Court would like.

25           THE COURT:  I've done it already.

1          MS. GIFFORD:  Thank you.

2          THE COURT:  I don't think I need you to do it.

3    I do have a question for you.  Are you in agreement that

4    the 347 is the actual statutory maximum?  You're talking

5    about the statutory maximum of 360, but you recognize that

6    credit should be given for time otherwise not creditable?

7          MS. GIFFORD:  That's correct.  He would not

8    otherwise receive credit for the first 13 months

9    incarcerated, and I do think fairness requires that you

10   get credit for those first 13 months, and the effective

11   sentence of 347 months would result in the statutory max

12   being served.

13         THE COURT:  All right.

14         MS. GIFFORD:  Thank you, Your Honor.

15         THE COURT:  Thank you.

16         Mr. Hessler, I'm required to consider quite a

17   number of factors when deciding how to sentence you.

18   They're all set forth in a statute called 18 U.S.C.

19   Section 3553(a).  I have considered all of those factors,

20   and I'm not going to run through them one by one for you,

21   but I want to talk to you about the factors that are most

22   significant in my decision today.

23         It's a tragedy that people create child

24   pornography.  It's just unspeakably harmful to victims who

25   are on the Internet forever and have to relive the horror

1    of what they went through.  These are the most distasteful

2    crimes that we ever see in federal court.  We see murders.

3    Those are violent, they're different, they're often crimes

4    of passion or greed, and they're horrific too.  But these

5    in many ways, these child pornography production cases,

6    really are the worst that we see.

7           Ms. Gifford is correct.  I think that the

8    horrific nature of these crimes has allowed some judges

9    and prompted some judges to -- and some prosecutors,

10   frankly -- to overpunish through consecutive sentences,

11   multiple counts and, in effect, have hundreds and hundreds

12   of months or even years of incarceration as the

13   punishment.  I believe that we have an obligation to look

14   carefully at the crime and look carefully at the defendant

15   and to try as best we can to objectively evaluate each

16   sentence.  So I'm not a fan of super long sentences.  I'm

17   not a fan of statutory maximum sentences.  But in this

18   case I think that a statutory maximum sentence is

19   appropriate.

20          I do think, from your point of view, that you

21   have received a benefit.  I think you almost certainly

22   could have been charged with other crimes than those that

23   you were charged with, certainly possession, and then we'd

24   have a possibility of a consecutive sentence as well.  So

25   the potential federal sentence, had there not been some

1    negotiation and discretion at the start, you could have

2    been facing a much, much longer sentence than you are.  So

3    this is going to be a long sentence, a very long sentence,

4    in my view, but I think an appropriate one in part because

5    you did receive the benefit of very useful negotiations.

6            You know, I'm sorry that you were treated badly

7    in prison and that you've had some problems in your life,

8    and so forth, and I don't mean to make little of those

9    issues, but they don't excuse what you did.  What you did

10   prompts the type of abuse that you've received.  I'm not

11   going to justify it, I'm not going to say it's the right

12   thing for anybody to do, but it's understandable.  Anyone

13   who is a parent, this is their worst nightmare.  XXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX  What we call

16   relevant conduct here, the uncharged related conduct is

17   equally bad.  The idea that you were trying to, quote

18   unquote, buy a sixth grader for a weekend of unlimited

19   sex -- and I'm not going to go into the details, but

20   they're bad -- it is horrific.  There are not words that

21   can characterize the wrongfulness of that conduct in so

22   many different ways.  And that weighs heavily in my

23   decision today.

24           The sentence is one that's going to punish you

25   for what you did because it is extremely wrongful conduct.

1    It's obviously going to deter you because you're going to

2    be in prison.  You're going to be unable to create these

3    types of products or view these types of videos ever

4    again.  You're going to be unable to put other children at

5    risk.  And, frankly, that's going to protect the public.

6              I appreciate that you've made strides since you

7    were arrested.  I hope you continue to make strides.  I

8    hope you are able somehow to come to terms with what

9    you've done and to show remorse and to put that remorse

10   into action by helping other people within the prison

11   system somehow.  That's going to take some work on your

12   part, frankly, because this is among the most serious

13   child pornography production offenses that I've come

14   across as a judge.

15             And I do think the federal system is going to be

16   a better place for you.  There are programs that will help

17   you help yourself.  I'm going to recommend to the Bureau

18   of Prisons that you be engaged in sex offender treatment,

19   that you be engaged in mental health treatment, that you

20   be evaluated for your mental health, and that you receive

21   appropriate medications to assist in controlling your

22   mental health, and that you receive substance abuse

23   treatment.

24             As I said in comments earlier, there are

25   facilities within the federal system that are sex offender

 1   facilities.  I hope that Fort Devens has an extensive

 2   program.  I am going to recommend that you be designated

 3   there or to another facility in New England with Sex

 4   Offender Management Program capabilities.

 5             And somehow you need to come to terms with what

 6   you did.  I don't know how you do that, but somehow, with

 7   the help of folks and a long term of imprisonment, you're

 8   going to have plenty of time to kind of sort this out and

 9   try to get yourself to a place where you're healthy,

10   frankly, because anybody who would commit these acts is

11   obviously sick.

12             I need to comment briefly on why I'm imposing

13   within the Guideline range the sentence that I am.  I

14   think that I have already essentially done that.  It's the

15   seriousness of the crime, it's the seriousness of the

16   relevant conduct, and it's the fact that you have an

17   agreement with state authorities to run what is a 30-year

18   state sentence concurrent with the federal sentence.  And

19   for those reasons I'm going to impose a sentence as

20   follows.

21             Before I do that, I should just briefly thank

22   the victim for coming in and for sharing your statement.

23   These are difficult things to live through, and the

24   comments that I've made about healing XXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX  I hope that you are

1  able to put this into your past soon and move forward,

2  have meaningful, happy lives.   XXXXXXXXXXXXXXXXXXXXXXXXXX

3  XXXXXXXXXXXXXXXXXXXXXXXXXXXX.

4          THE VICTIM:  Thank you, Your Honor.

5          THE COURT:  With those thoughts in mind, it's my

6  intention, Mr. Hessler, to sentence you as follows:

7          To a period of 347 months of imprisonment.  I'm

8  going to make the recommendation that I mentioned before

9  regarding programming and designation.

10          Following your release from incarceration,

11  you're going to be on supervised release for a period of

12  ten years.  I think that is plenty long in light of your

13  age upon release.  Ten years, you're going to be quite an

14  old man by that point and presumably beyond any ability to

15  harm anyone.

16          During the term of supervised release, the

17  mandatory conditions of supervised release set forth at

18  Guideline section 5D1.3(a)(1) that you not commit another

19  federal, state or local offense; (2) that you not

20  unlawfully possess controlled substances; (4) that you

21  refrain from unlawful use of controlled substances and

22  submit to drug testing; (6) that you make restitution and

23  pay the special assessment imposed -- I recognize

24  restitution has already been paid -- and (8), that you

25  cooperate in the collection of a DNA sample for use by law

1   enforcement will all apply, as will the standard

2   conditions of supervised release set forth at Guideline

3   section 5D1.3(c).

4         As special conditions of supervised release, I'm

5   going to order the following:

6         First, you must submit your residence, person,

7   office or vehicle to a search conducted by a U.S.

8   probation officer at a reasonable time and in a reasonable

9   manner, based upon a reasonable suspicion of contraband or

10  evidence of a violation of a condition of release.  Your

11  failure to submit to a search may be grounds for

12  revocation, and you must inform any other residents of the

13  premises where you live that they may be subject to

14  searches pursuant to this condition.

15        You must comply with the requirements of the Sex

16  Offender Registration and Notification Act as directed by

17  the probation office, the Bureau of Prisons, or any state

18  sex offender registration agency in which you reside -- in

19  any state in which you reside, work, are a student, or

20  were convicted of a qualifying offense.

21        You must participate in mental health treatment

22  with an emphasis on sex offender treatment as approved by

23  the U.S. Probation Office and must abide by the policies

24  and procedures of that program, which may include

25  polygraph testing.  You must pay all or a portion of the

1    costs associated with that treatment based on your ability

2    to pay as determined by the probation office.

3         You must submit to periodic polygraph testing at

4    the discretion of the probation office as a means to

5    ensure that you are in compliance with the requirements of

6    your supervision following the completion of the sex

7    offender treatment program.  You must pay all or a portion

8    of the costs associated with that testing based on your

9    ability to pay as determined by the probation office.

10        And, actually, for each of these when I say

11   "determined by the probation office," I should say "as

12   recommended by the probation office and approved by the

13   Court."

14        You must not possess any materials, including

15   pictures, photographs, books, writings, drawings, videos

16   or video games depicting what are described as child

17   pornography as defined in 18 U.S.C. Section 2256(A) or

18   otherwise contrary to anti-pornography laws of the United

19   States.

20        You must not associate with children under the

21   age of 18 except in the presence of a responsible adult

22   who is aware of the nature of your background and current

23   offense, and who has been approved by the probation

24   office.

25        You must provide the probation office with

1   access to any requested financial records, including but

2   not limited to telephone and cellular phone bills and

3   credit card statements.

4          You must not loiter around playgrounds, schools,

5   youth-oriented organizations or clubs, or in any other

6   place where children under the 18 -- age of 18 are known

7   to congregate.

8          You must not associate with or have contact with

9   convicted sex offenders or those considered inappropriate

10  by the probation office because of a connection to sexual

11  abuse of minors or sexually explicit materials involving

12  minors unless it's part of an approved counseling program.

13         You must not be employed in any position or

14  participate as a volunteer in any activity that involves

15  contact with children under the age of 18, except as

16  recommended by the probation officer and approved by the

17  Court.

18         You must also permit the probation office to

19  install and use monitoring programs on any computer

20  equipment.  You must bear the costs of said monitoring

21  programs.

22         You must submit all photographic equipment,

23  personal computers and other Internet-capable devices and

24  related equipment owned, controlled or used by you to a

25  review conducted by the U.S. Probation Office or its

1    designee at a reasonable time and in a reasonable manner,

2    without prior notice or search warrant, in order to verify

3    that the monitoring software has not been disabled.

4           And you must participate in a program

5    recommended by the probation officer and approved by the

6    Court for inpatient or outpatient substance abuse

7    treatment and testing.  You shall pay all or a portion of

8    the costs associated with that treatment based on your

9    ability to pay as recommended by the probation officer and

10   approved by the Court.

11          The reason for each of these special conditions

12   should be obvious.  They are all related to your current

13   problems, either sex-offender-type treatment, to make sure

14   that you're not pursuing children or viewing or producing

15   child pornography of any type, and they're intended to

16   help you gain control of your addictions, which I consider

17   both sexual and substance abuse addictions.  So each of

18   these is intended to permit the probation officers to

19   successfully and safely supervise you during that period

20   and are intended to help you rehabilitate to become a

21   useful member of society.

22          I'm going to waive a fine in this case based

23   upon a determination that Mr. Hessler cannot afford to pay

24   a fine within the Guideline range, especially in light of

25   the restitution and special assessments imposed.

1          I'm going to formally note that restitution in

2     the amount of $50,000 is payable.  I will acknowledge that

3     it has been paid.  I think I'm going to include that in

4     the judgment, both that it's payable and that it has been

5     paid.  And as I determined earlier, I'm going to impose a

6     special assessment of $5,100.

7          Mr. Hessler, should you violate any term or

8     condition of your supervised release, I want to make sure

9     you understand that you face another prison sentence for

10    any such violations.  You need to understand and comply

11    with each of the conditions of your supervised release

12    once you are out of prison.

13          Let me hear from either counsel if the sentence

14    that I just described cannot lawfully be imposed as the

15    sentence of the Court in this case.

16          MS. GIFFORD:  No objection, Your Honor.

17          MS. PHILLIPS:  No objection, Your Honor.

18          THE COURT:  Mr. Hessler, the sentence I just

19    described is imposed as the sentence in your case.  The

20    judgment will be prepared soon, and that's going to start

21    the clock running on your time within which to file a

22    notice of appeal.  You have 14 days from the entry of the

23    judgment within which to file a notice of appeal.  Do you

24    understand that time limit?

25          THE DEFENDANT:  Yes, Your Honor.

1              THE COURT:  All right.

2              MS. GIFFORD:  Let me note that he does have an

3     appellate waiver in his plea agreement.

4              THE COURT:  Yes.  I want to remind you that in

5     your written plea agreement you agreed to waive your right

6     to appeal your sentence under certain circumstances.  It

7     appears to me that those circumstances have been met; and,

8     accordingly, I think you've waived your right to appeal.

9     You should consult with your lawyer to determine whether

10    there are any fundamental defects in these proceedings

11    that you believe are not waived by your written plea

12    agreement.  Do you understand?

13             THE DEFENDANT:  Yes, Your Honor.  There's no

14    appeal.

15             THE COURT:  Well, whatever.  I need to --

16             THE DEFENDANT:  I fully take responsibility.

17             THE COURT:  If you wish to appeal but you cannot

18    afford to do so, you can file a motion to proceed in forma

19    pauperis.  If that motion is granted, the Court will waive

20    the filing fee for your appeal and will appoint a lawyer

21    to handle your appeal at no cost to you.  Do you

22    understand?

23             THE DEFENDANT:  Yes, Your Honor.

24             THE COURT:  This was a one-count information, so

25    there's no further matters to take up, is that right?

1              MS. GIFFORD:  That's correct, Your Honor.

2              THE COURT:  Well, in closing, let me --

3              MS. GIFFORD:  Your Honor, I'm sorry.  I do have

4     one matter.  Do you mind?

5              Throughout the proceedings, I've referred to the

6     identity of the victim.  XXXXXXXXXXXXXXXXXXXXXXXXX  And I

7     was just wondering if we could strike in the record any

8     identifying information about the minor victim.

9              And then to the extent that we have people

10    participating by ZOOM, just a reminder that the minor

11    victim's identity, which not just her name but other ways

12    that you could identify her, are not part of public

13    consumption.

14             THE COURT:  That's correct.  I'm going to order

15    that anyone who has come across that information through

16    ZOOM or otherwise is prohibited from disseminating it.

17             I will ask the court reporter to, in the

18    official record, to either redact or use initials or some

19    other form of protection.

20             And I'm going to grant the motion to seal the

21    sentencing memorandum, which is pending and has other

22    issues regarding the sealing.

23             MS. PHILLIPS:  Thank you, Your Honor.

24             THE COURT:  Ms. Gifford, did I cover what you

25    wanted?

1                MS. GIFFORD:  Yes.  Thank you, Your Honor.

2                THE COURT:  All right.

3                Well, again, thank you to the victim for coming.

4                And, Mr. Hessler, you have a very long sentence

5    ahead of you, and it's up to you how you use it.  You've

6    been discipline-free and apparently dealing with some of

7    your issues during your present incarceration, and I

8    encourage you to do the same for the remainder.  And I

9    hope that everyone can find a way to put this behind them.

10               We will stand in recess.

11               (Proceedings adjourned at 11:39 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

No. 3:19-cr-00303-SRU
United States of America v. Simon Hessler

       I, Sharon L. Masse, RMR, CRR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.

           December 22, 2020

          /S/ Sharon L. Masse
      Sharon L. Masse, RMR, CRR
       Official Court Reporter
       915 Lafayette Boulevard
    Bridgeport, Connecticut  06604
     sharon_masse@ctd.uscourts.gov